(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SAMSON *v.* CALIFORNIA

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

No. 04–9728.   Argued February 22, 2006—Decided June 19, 2006

Pursuant to a California statute—which requires every prisoner eligible for release on state parole to "agree in writing to be subject to search or seizure by a parole officer or other peace officer . . . , with or without a search warrant and with or without cause"—and based solely on petitioner's parolee status, an officer searched petitioner and found methamphetamine. The trial court denied his motions to suppress that evidence, and he was convicted of possession. Affirming, the State Court of Appeal held that suspicionless searches of parolees are lawful under California law and that the search in this case was reasonable under the Fourth Amendment because it was not arbitrary, capricious, or harassing.

*Held:* The Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee. Pp. 3–12.

  (a) The "totality of the circumstances" must be examined to determine whether a search is reasonable under the Fourth Amendment. *United States* v. *Knights,* 534 U. S. 112, 118. Reasonableness "is determined by assessing, on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*, at 118–119. Applying this approach in *Knights*, the Court found reasonable the warrantless search of a probationer's apartment based on reasonable suspicion and a probation condition authorized by California law. In evaluating the degree of intrusion into Knights' privacy, the Court found his probationary status "salient," *id.,* at 118, observing that probation is on a continuum of possible punishments and that probationers "do not enjoy 'the absolute liberty'" of other citizens, *id.,* at 119. It also found probation searches necessary to promote legitimate governmental interests of

integrating probationers back into the community, combating recidivism, and protecting potential victims. Balancing those interests, the intrusion was reasonable. However, because the search was predicated on both the probation search condition and reasonable suspicion, the Court did not address the reasonableness of a search solely predicated upon the probation condition. Pp. 3–5.

(b) Parolees, who are on the "continuum" of state-imposed punishments, have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence." *Morrissey* v. *Brewer,* 408 U. S. 471, 477. California's system is consistent with these observations. An inmate electing to complete his sentence out of physical custody remains in the Department of Corrections' legal custody for the remainder of his term and must comply with the terms and conditions of his parole. The extent and reach of those conditions demonstrate that parolees have severely diminished privacy expectations by virtue of their status alone. Additionally, as in *Knights,* the state law's parole search condition was clearly expressed to petitioner, who signed an order submitting to the condition and thus was unambiguously aware of it. Examining the totality of the circumstances, petitioner did not have an expectation of privacy that society would recognize as legitimate. The State's interests, by contrast, are substantial. A State has an "overwhelming interest" in supervising parolees because they "are more likely to commit future criminal offenses." *Pennsylvania Bd. of Probation and Parole* v. *Scott,* 524 U. S. 357, 365. Similarly, a State's interests in reducing recidivism, thereby promoting reintegration and positive citizenship among probationers and parolees, warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment. The Amendment does not render States powerless to address these concerns effectively. California's 60-to70-percent recidivism rate demonstrates that most parolees are ill prepared to handle the pressures of reintegration and require intense supervision. The State Legislature has concluded that, given the State's number of parolees and its high recidivism rate, an individualized suspicion requirement would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders. Contrary to petitioner's argument, the fact that some States and the Federal Government require a level of individualized suspicion before searching a parolee is of little relevance in determining whether California's system is drawn to meet the State's needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy. Nor is there merit to the argu-

ment that California's law grants discretion without procedural safeguards. The concern that the system gives officers unbridled discretion to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into society, is belied by the State's prohibition on arbitrary, capricious, or harassing searches. And petitioner's concern that the law frustrates reintegration efforts by permitting intrusions into the privacy interests of third persons is unavailing because that concern would arise under a suspicion-based system as well. Pp. 5–12.

Affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, GINSBURG, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–9728

DONALD CURTIS SAMSON, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

[June 19, 2006]

JUSTICE THOMAS delivered the opinion of the Court.

California law provides that every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause."  Cal. Penal Code Ann. §3067(a) (West 2000).  We granted certiorari to decide whether a suspicionless search, conducted under the authority of this statute, violates the Constitution.  We hold that it does not.

I

In September 2002, petitioner Donald Curtis Samson was on state parole in California, following a conviction for being a felon in possession of a firearm.  On September 6, 2002, Officer Alex Rohleder of the San Bruno Police Department observed petitioner walking down a street with a woman and a child.  Based on a prior contact with petitioner, Officer Rohleder was aware that petitioner was on parole and believed that he was facing an at large warrant.  Accordingly, Officer Rohleder stopped petitioner and asked him whether he had an outstanding parole warrant.

Petitioner responded that there was no outstanding warrant and that he "was in good standing with his parole agent." Brief for Petitioner 4. Officer Rohleder confirmed, by radio dispatch, that petitioner was on parole and that he did not have an outstanding warrant. Nevertheless, pursuant to Cal. Penal Code Ann. §3067(a) (West 2000) and based solely on petitioner's status as a parolee, Officer Rohleder searched petitioner. During the search, Officer Rohleder found a cigarette box in petitioner's left breast pocket. Inside the box he found a plastic baggie containing methamphetamine.

The State charged petitioner with possession of methamphetamine pursuant to Cal. Health & Safety Code Ann. §11377(a) (West 1991). The trial court denied petitioner's motion to suppress the methamphetamine evidence, finding that Cal. Penal Code Ann. §3067(a) (West 2000) authorized the search and that the search was not "arbitrary or capricious." App. 62–63 (Proceedings on Motion to Supress). A jury convicted petitioner of the possession charge and the trial court sentenced him to seven years' imprisonment.

The California Court of Appeal affirmed. Relying on *People* v. *Reyes*, 19 Cal. 4th 743, 968 P. 2d 445 (1998), the court held that suspicionless searches of parolees are lawful under California law; that "'[s]uch a search is reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing'"; and that the search in this case was not arbitrary, capricious, or harassing. No. A102394 (Ct. App. Cal., 1st App. Dist., Oct. 14, 2004), App. 12–14.

We granted certiorari, 545 U. S. ___ (2005), to answer a variation of the question this Court left open in *United States* v. *Knights,* 534 U. S. 112, 120, n. 6 (2001)—whether a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would

not offend the Fourth Amendment.[1]   Answering that question in the affirmative today, we affirm the judgment of the California Court of Appeal.

## II

"[U]nder our general Fourth Amendment approach" we "examin[e] the totality of the circumstances" to determine whether a search is reasonable within the meaning of the Fourth Amendment. *Id.*, at 118 (internal quotation marks omitted). Whether a search is reasonable "is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.*, at 118–119 (internal quotation marks omitted).

We recently applied this approach in *United States* v. *Knights*. In that case, California law required Knights, as a probationer, to "'[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer.'" *Id.,* at 114 (brackets in original). Several days after Knights had been placed on probation, police suspected that he had been involved in several incidents of arson and vandalism. Based upon that suspicion and pursuant to the search condition of his probation, a police officer conducted a warrantless search of Knights' apartment and found arson and drug paraphernalia. *Id.,* at 115–116.

We concluded that the search of Knights' apartment was reasonable. In evaluating the degree of intrusion into

---

[1] *Knights,* 534 U. S., at 120, n. 6 ("We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment").

Knights' privacy, we found Knights' probationary status "salient," *id.,* at 118, observing that "[p]robation is 'one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service.'" *Id.*, at 119 (quoting *Griffin* v. *Wisconsin,* 483 U. S. 868, 874 (1987)). Cf. *Hudson* v. *Palmer,* 468 U. S. 517, 530 (1984) (holding that prisoners have no reasonable expectation of privacy). We further observed that, by virtue of their status alone, probationers "'do not enjoy "the absolute liberty to which every citizen is entitled,"'" *Knights*, *supra*, at 119 (quoting *Griffin, supra,* at 874, in turn quoting *Morrissey* v. *Brewer*, 408 U. S. 471, 480 (1972)), justifying the "impos[ition] [of] reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Knights*, *supra*, at 119. We also considered the facts that Knights' probation order clearly set out the probation search condition, and that Knights was clearly informed of the condition. See *Knights*, 534 U. S., at 119. We concluded that under these circumstances, Knights' expectation of privacy was significantly diminished. See *id.,* at 119–120.

We also concluded that probation searches, such as the search of Knights' apartment, are necessary to the promotion of legitimate governmental interests. Noting the State's dual interest in integrating probationers back into the community and combating recidivism, see *id.,* at 120–121, we credited the "'assumption'" that, by virtue of his status, a probationer "'is more likely than the ordinary citizen to violate the law.'" *Id.*, at 120 (quoting *Griffin*, *supra*, at 880). We further found that "probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, and possible incarceration, in proceedings in

which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply." *Knights*, 534 U. S., at 120. We explained that the State did not have to ignore the reality of recidivism or suppress its interests in "protecting potential victims of criminal enterprise" for fear of running afoul of the Fourth Amendment. *Id.,* at 121.

Balancing these interests, we held that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Ibid.* Because the search at issue in *Knights* was predicated on both the probation search condition and reasonable suspicion, we did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation. *Id.,* at 120, n. 6. Our attention is directed to that question today, albeit in the context of a parolee search.

### III

As we noted in *Knights,* parolees are on the "continuum" of state-imposed punishments. *Id.,* at 119 (internal quotation marks omitted). On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this Court has pointed out, "parole is an established variation on imprisonment of convicted criminals. . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence." *Morrissey, supra*, at 477. "In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements." *Pennsylvania Bd. of Probation and Parole* v. *Scott,* 524 U. S. 357,

365 (1998). See also *United States* v. *Reyes*, 283 F. 3d 446, 461 (CA2 2002) ("[F]ederal supervised release, . . . in contrast to probation, is meted out in addition to, not in lieu of, incarceration" (citation and internal quotation marks omitted)); *United States* v. *Cardona*, 903 F. 2d 60, 63 (CA1 1990) ("[O]n the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers" (internal quotation marks and citation omitted)).[2]

California's system of parole is consistent with these observations: A California inmate may serve his parole period either in physical custody, or elect to complete his sentence out of physical custody and subject to certain conditions. Cal. Penal Code Ann. §3060.5 (West 2000). Under the latter option, an inmate-turned-parolee remains in the legal custody of the California Department of Corrections through the remainder of his term, §3056, and

_____

[2] Contrary to the dissent's contention, nothing in our recognition that parolees are more akin to prisoners than probationers is inconsistent with our precedents. Nor, as the dissent suggests, do we equate parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights. See *post*, at 5 (opinion of STEVENS, J.). That view misperceives our holding. If that were the basis of our holding, then this case would have been resolved solely under *Hudson* v. *Palmer*, 468 U. S. 517 (1984), and there would have been no cause to resort to Fourth Amendment analysis. See *ibid.* (holding traditional Fourth Amendment analysis of the totality of the circumstances inapplicable to the question whether a prisoner had a reasonable expectation of privacy in his prison cell). Nor is our rationale inconsistent with *Morrissey* v. *Brewer*, 408 U. S. 471, 482 (1972). In that case, the Court recognized that restrictions on a parolee's liberty are not unqualified. That statement, even if accepted as a truism, sheds no light on the extent to which a parolee's constitutional rights are indeed limited—and no one argues that a parolee's constitutional rights are not limited. *Morrissey* itself does not cast doubt on today's holding given that the liberty at issue in that case—the Fourteenth Amendment Due Process right to a hearing before revocation of parole—invokes wholly different analysis than the search at issue here.

must comply with all of the terms and conditions of parole, including mandatory drug tests, restrictions on association with felons or gang members, and mandatory meetings with parole officers, Cal. Code Regs., tit. 15, §2512 (2005); Cal. Penal Code Ann. §3067 (West 2000). See also *Morrissey*, *supra*, at 478 (discussing other permissible terms and conditions of parole). General conditions of parole also require a parolee to report to his assigned parole officer immediately upon release, inform the parole officer within 72 hours of any change in employment status, request permission to travel a distance of more than 50 miles from the parolee's home, and refrain from criminal conduct and possession of firearms, specified weapons, or knives unrelated to employment. Cal. Code Regs., tit. 15, §2512. Parolees may also be subject to special conditions, including psychiatric treatment programs, mandatory abstinence from alcohol, residence approval, and "[a]ny other condition deemed necessary by the Board [of Parole Hearings] or the Department [of Corrections and Rehabilitation] due to unusual circumstances." §2513. The extent and reach of these conditions clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone.

Additionally, as we found "salient" in *Knights* with respect to the probation search condition, the parole search condition under California law—requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer "at any time," Cal. Penal Code Ann. §3067(a) (West 2000)—was "clearly expressed" to petitioner. *Knights*, 534 U. S., at 119. He signed an order submitting to the condition and thus was "unambiguously" aware of it. *Ibid.* In *Knights*, we found that acceptance of a clear and unambiguous search condition "significantly diminished Knights' reasonable expectation of privacy." *Id.,* at 120. Examining the totality of the circumstances pertaining to petitioner's status as a

parolee, "an established variation on imprisonment," *Morrissey,* 408 U. S., at 477, including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate.[3]

The State's interests, by contrast, are substantial. This Court has repeatedly acknowledged that a State has an "overwhelming interest" in supervising parolees because "parolees. . . are more likely to commit future criminal offenses." *Pennsylvania Bd. of Probation and Parole,* 524 U. S., at 365 (explaining that the interest in combating recidivism "is the very premise behind the system of close parole supervision"). Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizen-

———————

[3] Because we find that the search at issue here is reasonable under our general Fourth Amendment approach, we need not reach the issue whether "acceptance of the search condition constituted consent in the *Schneckloth* [v. *Bustamonte*, 412 U. S. 218 (1973),] sense of a complete waiver of his Fourth Amendment rights." *United States* v. *Knights,* 534 U. S. 112, 118 (2001). The California Supreme Court has not yet construed Cal. Penal Code Ann. §3067 (West 2000), the statute which governs parole for crimes committed after 1996, and which imposes the consent requirement. The California Court of Appeal has, and it has concluded that, under §3067(b), "inmates who are otherwise eligible for parole yet refuse to agree to the mandatory search condition will remain imprisoned . . . until either the inmate (1) agrees to the search condition and is otherwise eligible for parole or (2) has lost all worktime credits and is eligible for release after having served the balance of his/her sentence." *People* v. *Middleton*, 131 Cal. App. 4th 732, 739–740, 31 Cal. Rptr. 3d 813, 818 (2005). Nonetheless, we decline to rest our holding today on the consent rationale. The California Supreme Court, we note, has not yet had a chance to address the question squarely, and it is far from clear that the State properly raised its consent theory in the courts below.

Nor do we address whether California's parole search condition is justified as a special need under *Griffin* v. *Wisconsin*, 483 U. S. 868 (1987), because our holding under general Fourth Amendment principles renders such an examination unnecessary.

ship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment. See *Griffin*, 483 U. S., at 879; *Knights*, *supra,* at 121.

The empirical evidence presented in this case clearly demonstrates the significance of these interests to the State of California. As of November 30, 2005, California had over 130,000 released parolees. California's parolee population has a 68-to-70 percent recidivism rate. See California Attorney General, Crime in California 37 (Apr. 2001) (explaining that 68 percent of adult parolees are returned to prison, 55 percent for a parole violation, 13 percent for the commission of a new felony offense); J. Petersilia, Challenges of Prisoner Reentry and Parole in California, 12 California Policy Research Center Brief, p. 2 (June 2000), available at http://www.ucop.edu/cprc/parole.pdf (as visited June 15, 2006, and available in Clerk of Court's case file) ("70% of the state's paroled felons reoffend within 18 months—the highest recidivism rate in the nation"). This Court has acknowledged the grave safety concerns that attend recidivism. See *Ewing* v. *California,* 538 U. S. 11, 26 (2003) (plurality opinion) ("Recidivism is a serious public safety concern in California and throughout the Nation").

As we made clear in *Knights*, the Fourth Amendment does not render the States powerless to address these concerns *effectively*. See 534 U. S., at 121. Contrary to petitioner's contention, California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society.

In California, an eligible inmate serving a determinate sentence may elect parole when the actual days he has served plus statutory time credits equal the term imposed by the trial court, Cal. Penal Code Ann. §§2931, 2933,

3000(b)(1) (West 2000), irrespective of whether the inmate is capable of integrating himself back into productive society. As the recidivism rate demonstrates, most parolees are ill prepared to handle the pressures of reintegration. Thus, most parolees require intense supervision. The California Legislature has concluded that, given the number of inmates the State paroles and its high recidivism rate, a requirement that searches be based on individualized suspicion would undermine the State's ability to effectively supervise parolees and protect the public from criminal acts by reoffenders. This conclusion makes eminent sense. Imposing a reasonable suspicion requirement, as urged by petitioner, would give parolees greater opportunity to anticipate searches and conceal criminality. See *Knights*, *supra,* at 120; *Griffin*, 483 U. S., at 879. This Court concluded that the incentive-to-conceal concern justified an "intensive" system for supervising probationers in *Griffin*, *id.,* at 875. That concern applies with even greater force to a system of supervising parolees. See *United States* v. *Reyes*, 283 F. 3d, at 461 (observing that the *Griffin* rationale "appl[ies] *a fortiori*" to "federal supervised release, which, in contrast to probation, is 'meted out in addition to, not in lieu of, incareration'"); *United States* v. *Crawford*, 372 F. 3d 1048, 1077 (CA9 2004) (en banc) (Kleinfeld, J., concurring) (explaining that parolees, in contrast to probationers, "have been sentenced to prison for felonies and released before the end of their prison terms" and are "deemed to have acted more harmfully than anyone except those felons not released on parole"); *Hudson*, 468 U. S., at 526 (persons sentenced to terms of imprisonment have been "deemed to have acted more harmfully than anyone except those felons not released on parole"); *id.,* at 529 (observing that it would be "naive" to institute a system of "'planned random searches'" as that would allow prisoners to "anticipate" searches, thus defeating the purpose of random searches).

Petitioner observes that the majority of States and the Federal Government have been able to further similar interests in reducing recidivism and promoting reintegration, despite having systems that permit parolee searches based upon some level of suspicion. Thus, petitioner contends, California's system is constitutionally defective by comparison. Petitioner's reliance on the practices of jurisdictions other than California, however, is misplaced. That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy.[4]

Nor is there merit to the argument that California's parole search law permits "a blanket grant of discretion

---

[4] The dissent argues that, "once one acknowledges that parolees do have legitimate expectations of privacy beyond those of prisoners, our Fourth Amendment jurisprudence does not permit the conclusion, reached by the Court here for the first time, that a search supported by neither individualized suspicion nor 'special needs' is nonetheless 'reasonable.'" *Post*, at 2. That simply is not the case. The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion. Thus, while this Court's jurisprudence has often recognized that "to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 560 (1976), we have also recognized that the "Fourth Amendment imposes no irreducible requirement of such suspicion," *id.*, at 561. Therefore, although this Court has only sanctioned suspicionless searches in limited circumstances, namely programmatic and special needs searches, we have never held that these are the only limited circumstances in which searches absent individualized suspicion could be "reasonable" under the Fourth Amendment. In light of California's earnest concerns respecting recidivism, public safety, and reintegration of parolees into productive society, and because the object of the Fourth Amendment is *reasonableness*, our decision today is far from remarkable. Nor, given our prior precedents and caveats, is it "unprecedented." *Post*, at 1.

untethered by any procedural safeguards," *post,* at 1 (STEVENS, J., dissenting). The concern that California's suspicionless search system gives officers unbridled discretion to conduct searches, thereby inflicting dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society, is belied by California's prohibition on "arbitrary, capricious or harassing" searches. See *Reyes,* 19 Cal. 4th, at 752, 753–754, 968 P. 2d, at 450, 451; *People* v. *Bravo,* 43 Cal. 3d 600, 610, 738 P. 2d 336, 342 (1987) (probation); see also Cal. Penal Code Ann. §3067(d) (West 2000) ("It is not the intent of the Legislature to authorize law enforcement officers to conduct searches for the sole purpose of harassment").[5] The dissent's claim that parolees under California law are subject to capricious searches conducted at the unchecked "whim" of law enforcement officers, *post*, at 3, 4, ignores this prohibition. Likewise, petitioner's concern that California's suspicionless search law frustrates reintegration efforts by permitting intrusions into the privacy interests of third parties is also unavailing because that concern would arise under a suspicion-based regime as well.

### IV

Thus, we conclude that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee. Accordingly, we affirm the judgment of the California Court of Appeal.

*It is so ordered.*

---

[5] Under California precedent, we note, an officer would not act reasonably in conducting a suspicionless search absent knowledge that the person stopped for the search is a parolee. See *People* v. *Sanders*, 31 Cal. 4th 318, 331–332, 73 P. 3d 496, 505–506 (2003); Brief for United States as *Amicus Curiae* 20.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–9728

———————

## DONALD CURTIS SAMSON, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT

[June 19, 2006]

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE BREYER join, dissenting.

Our prior cases have consistently assumed that the Fourth Amendment provides some degree of protection for probationers and parolees. The protection is not as robust as that afforded to ordinary citizens; we have held that probationers' lowered expectation of privacy may justify their warrantless search upon reasonable suspicion of wrongdoing, see *United States* v. *Knights,* 534 U. S. 112 (2001). We have also recognized that the supervisory responsibilities of probation officers, who are required to provide "'individualized counseling'" and to monitor their charges' progress, *Griffin* v. *Wisconsin,* 483 U. S. 868, 876–877 (1987), and who are in a unique position to judge "how close a supervision the probationer requires," *id.*, at 876, may give rise to special needs justifying departures from Fourth Amendment strictures. See *ibid.* ("Although a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against the ordinary citizen"). But neither *Knights* nor *Griffin* supports a regime of suspicionless searches, conducted pursuant to a blanket grant of discretion untethered by any procedural safeguards, by law enforcement personnel who have no special interest in the welfare of the parolee or probationer.

What the Court sanctions today is an unprecedented curtailment of liberty. Combining faulty syllogism with circular reasoning, the Court concludes that parolees have no more legitimate an expectation of privacy in their persons than do prisoners. However superficially appealing that parity in treatment may seem, it runs roughshod over our precedent. It also rests on an intuition that fares poorly under scrutiny. And once one acknowledges that parolees do have legitimate expectations of privacy beyond those of prisoners, our Fourth Amendment jurisprudence does not permit the conclusion, reached by the Court here for the first time, that a search supported by neither individualized suspicion nor "special needs" is nonetheless "reasonable."

The suspicionless search is the very evil the Fourth Amendment was intended to stamp out. See *Boyd* v. *United States,* 116 U. S. 616, 625–630 (1886); see also, *e.g.*, *Indianapolis* v. *Edmond,* 531 U. S. 32, 37 (2000). The pre-Revolutionary "writs of assistance," which permitted roving searches for contraband, were reviled precisely because they "placed 'the liberty of every man in the hands of every petty officer.'" *Boyd,* 116 U. S., at 625. While individualized suspicion "is not an 'irreducible' component of reasonableness" under the Fourth Amendment, *Edmond,* 531 U. S., at 37 (quoting *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 561 (1976)), the requirement has been dispensed with only when programmatic searches were required to meet a "'special need' . . . divorced from the State's general interest in law enforcement." *Ferguson* v. *Charleston,* 532 U. S. 67, 79 (2001); see *Edmond,* 531 U. S., at 37; see also *Griffin,* 483 U. S., at 873 ("Although we usually require that a search be undertaken only pursuant to a warrant (and thus supported by probable cause, as the Constitution says warrants must be), . . . we have permitted exceptions when 'special needs, beyond the normal need for law enforcement, make the

warrant and probable-cause requirement impracticable'").

Not surprisingly, the majority does not seek to justify the search of petitioner on "special needs" grounds. Although the Court has in the past relied on special needs to uphold warrantless searches of probationers, *id.*, at 873, 880, it has never gone so far as to hold that a probationer or parolee may be subjected to full search at the whim of any law enforcement officer he happens to encounter, whether or not the officer has reason to suspect him of wrongdoing. *Griffin*, after all, involved a search *by a probation officer* that was supported by *reasonable suspicion*. The special role of probation officers was critical to the analysis; "we deal with a situation," the Court explained, "in which there is an ongoing supervisory relationship—and one that is not, or at least not entirely, adversarial—between the object of the search and the decisionmaker." *Id.*, at 879. The State's interest or "special need," as articulated in *Griffin*, was an interest in supervising the wayward probationer's reintegration into society—not, or at least not principally, the general law enforcement goal of detecting crime, see *ante*, at 8–9.[1]

---

[1] As we observed in *Ferguson* v. *Charleston,* 532 U. S. 67 (2001), *Griffin*'s special needs rationale was cast into doubt by our later decision in *Skinner* v. *Railway Labor Executives' Assn.,* 489 U. S. 602 (1989), which reserved the question whether "'routine use in criminal prosecutions of evidence obtained pursuant to the administrative scheme would give rise to an inference of pretext, or otherwise impugn the administrative nature of the . . . program,'" *Ferguson*, 532 U. S., at 79, n. 15 (quoting *Skinner*, 489 U. S., at 621, n. 5). But at least the State in *Griffin* could in good faith contend that its warrantless searches were supported by a special need conceptually distinct from law enforcement goals generally. Indeed, that a State's interest in supervising its parolees and probationers to ensure their smooth reintegration may occasionally diverge from its general law enforcement aims is illustrated by this very case. Petitioner's possession of a small amount of illegal drugs would not have been grounds for revocation of his parole. See Cal. Penal Code Ann. §3063.1(a) (West Supp. 2006). Presumably, the California Legislature determined that it is unnecessary and perhaps even counterproductive, as a means of further-

It is no accident, then, that when we later upheld the search of a probationer *by a law enforcement officer* (again, based on reasonable suspicion), we forwent any reliance on the special needs doctrine. See *Knights,* 534 U. S. 112. Even if the supervisory relationship between a probation officer and her charge may properly be characterized as one giving rise to needs "divorced from the State's general interest in law enforcement," *Ferguson*, 532 U. S., at 79; but see *id.*, at 79, n. 15, the relationship between an ordinary law enforcement officer and a probationer unknown to him may not. "None of our special needs precedents has sanctioned the routine inclusion of law enforcement, both in the design of the policy and in using arrests, either threatened or real, to implement the system designed for the special needs objectives." *Id.*, at 88 (KENNEDY, J., concurring in judgment).

Ignoring just how "closely guarded" is that "category of constitutionally permissible suspicionless searches," *Chandler* v. *Miller,* 520 U. S. 305, 309 (1997), the Court for the first time upholds an entirely suspicionless search unsupported by any special need. And it goes further: In special needs cases we have at least insisted upon programmatic safeguards designed to ensure evenhandedness in application; if individualized suspicion is to be jettisoned, it must be replaced with measures to protect against the state actor's unfettered discretion. See, *e.g.*, *Delaware* v. *Prouse,* 440 U. S. 648, 654–655 (1979) (where a special need "precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field'" (quoting *Camara* v. *Municipal*

———————

ing the goals of the parole system, to reincarcerate former prisoners for simple possession. The general law enforcement interests the State espouses, by contrast, call for reincarceration.

*Court of City and County of San Francisco,* 387 U. S. 523, 532 (1967); footnote omitted); *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 882 (1975) ("[T]he reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government"). Here, by contrast, there are no policies in place—no "standards, guidelines, or procedures," *Prouse,* 440 U. S., at 650—to rein in officers and furnish a bulwark against the arbitrary exercise of discretion that is the height of unreasonableness.

The Court is able to make this unprecedented move only by making another. Coupling the dubious holding of *Hudson* v. *Palmer,* 468 U. S. 517 (1984), with the bald statement that "parolees have fewer expectations of privacy than probationers," *ante,* at 5, the Court two-steps its way through a faulty syllogism and, thus, avoids the application of Fourth Amendment principles altogether. The logic, apparently, is this: Prisoners have no legitimate expectation of privacy; parolees are like prisoners; therefore, parolees have no legitimate expectation of privacy. The conclusion is remarkable not least because we have long embraced its opposite.[2] It also rests on false premises. First, it is simply not true that a parolee's status, vis-à-vis either the State or the Constitution, is tantamount to that of a prisoner or even materially distinct from that of a probationer. See *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972) ("Though the State properly subjects [a parolee] to many restrictions not applicable to other

_____

[2] See *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972) ("[T]he liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty"); *Griffin* v. *Wisconsin,* 483 U. S. 868, 875 (1987) (the "degree of impingement upon [a probationer's] privacy . . . is not unlimited"); see also *Ferguson,* 532 U. S., at 101 (SCALIA, J., dissenting) ("I doubt whether Griffin's reasonable expectation of privacy in his home was any less than petitioners' reasonable expectation of privacy in their urine taken").

citizens, his condition is very different from that of con-
finement in a prison"). A parolee, like a probationer, is set
free in the world subject to restrictions intended to facili-
tate supervision and guard against antisocial behavior. As
with probation, "the State is willing to extend parole only
because it is able to condition it upon compliance with
certain requirements." *Pennsylvania Bd. of Probation and
Parole* v. *Scott,* 524 U. S. 357, 365 (1998). Certainly,
parole differs from probation insofar as parole is "'meted
out in addition to, not in lieu of, incarceration.'" *Ante*, at 6
(quoting *United States* v. *Reyes*, 283 F. 3d 446, 461 (CA2
2002)). And, certainly, parolees typically will have com-
mitted more serious crimes—ones warranting a prior term
of imprisonment—than probationers. The latter distinc-
tion, perhaps, would support the conclusion that a State
has a stronger interest in supervising parolees than it
does in supervising probationers. But see *United States* v.
*Williams*, 417 F. 3d 373, 376, n. 1 (CA3 2005) ("'[T]here is
no constitutional difference between probation and parole
for purposes of the [F]ourth [A]mendment'"). But why
either distinction should result in refusal to acknowledge
as legitimate, when harbored by parolees, the same expec-
tation of privacy that probationers reasonably may harbor
is beyond fathom.

In any event, the notion that a parolee legitimately
expects only so much privacy as a prisoner is utterly with-
out foundation. *Hudson* v. *Palmer* does stand for the
proposition that "[a] right of privacy in traditional Fourth
Amendment terms" is denied individuals who are incar-
cerated. 468 U. S., at 527. But this is because it "is neces-
sary, as a practical matter, to accommodate a myriad of
'institutional needs and objectives' of prison facilities, . . .
chief among which is internal security." *Id.*, at 524; see
*id.*, at 538 (O'Connor, J., concurring) ("I agree that the
government's compelling interest in prison safety, together
with the necessarily ad hoc judgments required of prison

officials, make prison cell searches and seizures appropriate for categorical treatment"[3]); see also *Treasury Employees* v. *Von Raab,* 489 U. S. 656, 680 (1989) (SCALIA, J., dissenting). These "institutional needs"—safety of inmates and guards, "internal order," and sanitation, *Hudson*, 468 U. S., at 527–528—manifestly do not apply to parolees. As discussed above and in *Griffin*, *other* state interests may warrant certain intrusions into a parolee's privacy, but *Hudson*'s rationale cannot be mapped blindly onto the situation with which we are presented in this case.

Nor is it enough, in deciding whether someone's expectation of privacy is "legitimate," to rely on the existence of the offending condition or the individual's notice thereof. Cf. *ante*, at 7. The Court's reasoning in this respect is entirely circular. The mere fact that a particular State refuses to acknowledge a parolee's privacy interest cannot mean that a parolee in that State has no expectation of privacy that society is willing to recognize as legitimate— especially when the measure that invades privacy is both the *subject* of the Fourth Amendment challenge and a clear outlier. With only one or two arguable exceptions, neither the Federal Government nor any other State subjects parolees to searches of the kind to which petitioner was subjected. And the fact of notice hardly cures the circularity; the loss of a subjective expectation of privacy would play "no meaningful role" in analyzing the legitimacy of expectations, for example, "if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry." *Smith* v. *Maryland,* 442 U. S. 735, 740–741, n. 5

——————

[3] Particularly in view of Justice O'Connor's concurrence, which emphasized the prison's programmatic interests in conducting suspicionless searches, see *Hudson,* 468 U. S., at 538, *Hudson* is probably best understood as a "special needs" case—not as standing for the blanket proposition that prisoners have no Fourth Amendment rights.

(1979).[4]

Threaded through the Court's reasoning is the suggestion that deprivation of Fourth Amendment rights is part and parcel of any convict's punishment. See *ante*, at 4–6.[5] If a person may be subject to random and suspicionless searches in prison, the Court seems to assume, then he cannot complain when he is subject to the same invasion outside of prison, so long as the State still *can* imprison him. Punishment, though, is not the basis on which *Hudson* was decided. (Indeed, it is settled that a prison inmate "'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Turner* v. *Safley,* 482 U. S. 78, 95 (1987).) Nor, to my knowledge, have we ever sanctioned the use of any search as a punitive measure. Instead, the question in every case must be whether the balance of legitimate expectations of privacy, on the one hand, and the State's interests in conducting the relevant search, on the other, justifies dispensing with

_____

[4] Likewise, the State's argument that a California parolee "consents" to the suspicionless search condition is sophistry. Whether or not a prisoner can choose to remain in prison rather than be released on parole, cf. *ante*, at 8, n. 3, he has no "choice" concerning the search condition; he may either remain in prison, where he will be subjected to suspicionless searches, or he may exit prison and still be subject to suspicionless searches. Accordingly, "to speak of consent in this context is to resort to a manifest fiction, for the [parolee] who purportedly waives his rights by accepting such a condition has little genuine option to refuse." 5 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §10.10(b), pp. 440–441 (4th ed. 2004).

[5] This is a vestige of the long-discredited "act of grace" theory of parole. Compare *Escoe* v. *Zerbst,* 295 U. S. 490, 492–493 (1935) ("Probation or suspension of sentence comes as an act of grace to one convicted of a crime, and may be coupled with such conditions in respect of its duration as Congress may impose"), with *Gagnon* v. *Scarpelli,* 411 U. S. 778, 782, n. 4 (1973) ("a probationer can no longer be denied due process, in reliance on the dictum in *Escoe* v. *Zerbst,* that probation is an 'act of grace'" (citation omitted)). See also *Morrissey,* 408 U. S., at 482.

the warrant and probable-cause requirements that are otherwise dictated by the Fourth Amendment. That balance is not the same in prison as it is out. We held in *Knights*—without recourse to *Hudson*—that the balance favored allowing the State to conduct searches based on reasonable suspicion. Never before have we plunged below that floor absent a demonstration of "special needs."

Had the State imposed as a condition of parole a requirement that petitioner submit to random searches by his parole officer, who is "supposed to have in mind the welfare of the [parolee]" and guide the parolee's transition back into society, *Griffin*, 483 U. S., at 876–877, the condition might have been justified either under the special needs doctrine or because at least part of the requisite "reasonable suspicion" is supplied in this context by the individual-specific knowledge gained through the supervisory relationship. See *id.*, at 879 (emphasizing probation office's ability to "assess probabilities in the light of its knowledge of [the probationer's] life, character, and circumstances"). Likewise, this might have been a different case had a court or parole board imposed the condition at issue based on specific knowledge of the individual's criminal history and projected likelihood of reoffending, or if the State had had in place programmatic safeguards to ensure evenhandedness. See *supra*, at 4. Under either of those scenarios, the State would at least have gone some way toward averting the greatest mischief wrought by officials' unfettered discretion. But the search condition here is imposed on *all* parolees—whatever the nature of their crimes, whatever their likelihood of recidivism, and whatever their supervisory needs—without any programmatic procedural protections.[6]

---

[6] The Court devotes a good portion of its analysis to the recidivism rates among parolees in California. See *ante*, at 8–9. One might question whether those statistics, which postdate the California Su-

The Court seems to acknowledge that unreasonable searches "inflic[t] dignitary harms that arouse strong resentment in parolees and undermine their ability to reintegrate into productive society." *Ante*, at 11; see *Terry* v. *Ohio,* 392 U. S. 1, 19, 29 (1968). It is satisfied, however, that the California courts' prohibition against "'arbitrary, capricious or harassing'" searches suffices to avert those harms—which are of course counterproductive to the State's purported aim of rehabilitating former prisoners and reintegrating them into society. See *ante*, at 11 (citing *People* v. *Reyes*, 19 Cal. 4th 743, 968 P. 2d 445 (1998)). I am unpersuaded. The requirement of individualized suspicion, in all its iterations, is the shield the Framers selected to guard against the evils of arbitrary action, caprice, and harassment. To say that those evils may be averted without that shield is, I fear, to pay lipservice to the end while withdrawing the means.[7]

Respectfully, I dissent.

―――――――――

preme Court's decision to allow the purportedly recidivism-reducing suspicionless searches at issue here, actually demonstrate that the State's interest is being served by the searches. Cf. Reply Brief for Petitioner 10, and n. 10. Of course, one cannot deny that the interest itself is valid. That said, though, it has never been held sufficient to justify suspicionless searches. If high crime rates were grounds enough for disposing of Fourth Amendment protections, the Amendment long ago would have become a dead letter.

[7]As the Court observes, see *ante*, at 12, n. 5, under California law "an officer is entitled to conduct suspicionless searches only of persons known by him to be parolees." Brief for United States as *Amicus Curiae* 20 (citing *People* v. *Sanders*, 31 Cal. 4th 318, 331–332, 73 P. 3d 496, 505 (2003)). It would necessarily be arbitrary, capricious, and harassing to conduct a suspicionless search of someone without knowledge of the status that renders that person, in the State's judgment, susceptible to such an invasion.