**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Ronald Teck Hua TIONG,**
**Defendant–Appellee.**

**United States of America,**
**Plaintiff–Appellant,**

v.

**Raul Miguel Rubio–Alabau,**
**Defendant–Appellee.**

**Nos. 99–30167, 99–30168.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 2000.

Filed Sept. 6, 2000.

Joseph Harrington, AUSA, Spokane, Washington, for the plaintiff-appellant.

Carl Oreskovich, Holden & Oreskovich, P.S., Spokane, Washington, for defendant-appellee Rubio–Alabau.

Carl Oreskovich (argued), Holden & Oreskovich, P.S., Spokane, Washington, for defendant-appellee Tiong.

George M. Ahrend, P.S., and Christian J. Phelps, John Cooney & Associates, (briefed), Spokane, Washington, for defendant-appellee Tiong.

Before: TROTT, KLEINFELD, and SILVERMAN, Circuit Judges.

KLEINFELD, Circuit Judge:

The only issue in this case is whether there was a sufficient articulated basis for reasonable suspicion for a vehicle stop.

### I. FACTS

These facts come from the testimony at the suppression hearing. There were no substantial factual disputes.

A rental car came across the border around 5:30 in the morning, north of a little town in Eastern Washington called Oroville. It was still dark. The driver, Mr. Rubio, told the customs inspector that he was driving from the Canadian resort town, Penticton, to visit his girlfriend in Seattle. He seemed nervous, and it seemed a little unusual to the inspector for him to have left Penticton, as he would have had to, during the wee hours of the morning. The inspector looked through the things in the car, and found a hand drawn map with directions on how to get from the Canadian side to what the inspector thought was a smuggling area on the American side, but nothing else suspicious in the car.

The inspector suspected a "walk around." That is, he suspected that Mr. Rubio was a driver for a smuggler who would walk across the border to get around the Customs stop at the port of entry. A road along the Similkimeen River [1] runs parallel to the border and just south of it, from a quarter of a mile to about a mile and a half from the border. The road goes from Oroville, which is about four miles south of the border on Highway 97, northwest to Nighthawk, another port of entry twelve or fourteen miles west. The Customs inspectors suspected that the river road was a smugglers' rendezvous, for three reasons. First, it made sense. The road runs north and east from Oroville to within a quarter of a mile from the border, and the area is crisscrossed with dirt tracks of old logging roads, so it would be convenient for a smuggler to walk across to it. And the pickup could be discreet, because hardly anyone is there who might see them. A nine mile stretch has only five houses, and there are not a whole lot of reasons for anyone to be on this obscure country road to Nighthawk. Second, they have "intelligence" that smugglers walk across in this area, which we assume means that criminals they have caught have told them so. Third, they have found foot and vehicle tracks that suggested smugglers had probably walked across and not gotten caught.

Based on his suspicions, the inspector who talked to Rubio had another inspector drive four miles south of the port of entry to Oroville and park where he could see the intersection with the Similkimeen River Road. Mr. Rubio had said that all he planned to do in the United States was to go visit his girlfriend in Seattle, so in the ordinary course he would stay on route 97, the road he was on, from the border, and continue driving south from the port of entry through the little town of Oroville down to the interstate, for the quick and easy drive to Seattle. But if he were going to pick someone up on what the inspectors thought of as the smugglers' road, then he would turn right at the intersection.

Mr. Rubio turned right. So one of the inspectors called a border patrol agent in the area and had him go west on the Similkimeen River road to see what Mr. Rubio did. Driving east perhaps twenty minutes after Mr. Rubio had, he passed Mr. Rubio driving east, back toward Oroville, this time with a passenger. They were about two miles east of Oroville, next to a golf course, closer to Oroville than what the inspectors thought of as the likely smugglers' rendezvous. The border patrol agent turned around and stopped the car, and as he approached it, smelled marijuana from the open drivers window. The passenger was sweaty and had a streak of dirt on his back, which matched a streak of dirt on one of several duffels full of mari-

---

1. Perhaps suggestive of its obscurity, this road has multiple names in the record: Similkimeen Road, Nighthawk Road, Loomis–Nighthawk Road, Central Avenue within Oro- ville, and an unnamed road along the river, and the river is variously spelled in the record.

juana. One of the duffels was open on the back seat, apparently emitting the smell.

Mr. Rubio–Alabau and the passenger he picked up east of Oroville, Mr. Tiong, were indicted for marijuana smuggling, conspiracy, and possession with intent to distribute. They moved to suppress the evidence found in the car, the several duffels (90 pounds) of marijuana. The district court granted the motion. The judge found that turning right onto the Similkimeen River road was not necessarily inconsistent with going to Seattle, the location of the stop was well west of the suspected smugglers' rendezvous, and the evidence for it being a smugglers' rendezvous was unimpressive.

## II. ANALYSIS

■ This is an interlocutory appeal from the granting of a motion to suppress. We have jurisdiction.[2] A district court's determination whether reasonable suspicion existed to justify an investigatory stop is a question of law reviewed de novo,[3] but we review findings of fact for clear error.[4]

■ The Fourth Amendment entitles a person to drive down a road without being stopped by the government, unless the law enforcement officer who stops him has a reasonable suspicion based on articulable facts of criminal activity.[5] "Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion."[6]

Viewing the customs inspectors' and border patrol agent's testimony de novo, as we must, we conclude that they did indeed have reasonable suspicion based on

articulated facts. Far from being an unjustified stop, this was model police work. Finally they caught two of the suspected smugglers using the suspected smugglers' road, by dint of intelligence and coordination.

Here are a few factors that the Supreme Court has set forth, not to the exclusion of others, that may give rise to reasonable suspicion:

(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the drive including obvious attempts to evade officers; (6) appearance or behavior of the passengers; (7) model and appearance of the vehicle; and (8) officer experience.[7]

They fit this case well.

■ For an area to give rise to reasonable suspicion, it is enough that there is a good reason that the police can articulate for why they think that the location contributes to the suspicion.[8] There was. The road was suspected of being a smugglers' rendezvous for three good reasons: for a smuggler, it made a very convenient and sensible rendezvous, tracks indicated it had been used as a rendezvous, and "intelligence" information said it was a rendezvous. Proximity to the border could hardly be better—an easy walk over old logging roads, in some places less than a mile. Plenty of people walk that far for lunch, so it would certainly make sense for smugglers to walk that far if they could reasonably hope to avoid getting caught and make a lot of money. These three

**2.** 18 U.S.C. § 3731; *United States v. Wallace,* 213 F.3d 1216, 1218 (9th Cir.2000).

**3.** *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

**4.** *United States v. Michael R.,* 90 F.3d 340, 345–46 (9th Cir.1996).

**5.** *Ornelas,* 517 U.S. at 692, 116 S.Ct. 1657.

**6.** *United States v. Montero–Camargo,* 208 F.3d 1122, 1129 (9th Cir.2000) (en banc).

**7.** *United States v. Garcia–Barron,* 116 F.3d 1305, 1307 (9th Cir.1997) (citing *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

**8.** *Montero–Camargo,* 208 F.3d at 1129 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.") (quoting *Illinois v. Wardlow,* — U.S. —, —, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000)).

reasons for treating the area as a factor giving rise to suspicion—that it was a good place to commit the crime, the police had heard that it was regularly used for crime, and tracks had been found consistent with that use—were enough to make the area a factor giving rise to reasonable suspicion.

As for traffic patterns and time of day, they could not be much stronger as grounds for reasonable suspicion. The sensible way to go to Seattle was to continue south on 97 to the interstate and turn west on the interstate. There was no reason for a person driving directly to Seattle to see his girlfriend to turn right onto this country road. It was hard to even get lost and wind up there accidentally, because it required a nonobvious turn onto a smaller road at an intersection in a little town a through driver would hardly notice. A diverting drive in the country made even less sense at 5:30 in the morning after setting out in the wee hours of the morning. What else would a nonresident do on the Similkimeen River road at that hour except pick up a smuggler? It would not have the look of a good place to find an all night restaurant, bathroom, or gas station.

Thus the officers started out with a little suspicion based on the driver's shaky hands and nervous look, and the hand drawn map of the border crossing area, and his inability to tell them what his Seattle girlfriend's address was. They did not stop him on that limited basis. When he turned onto the country road to the reasonably suspected smugglers' rendezvous for no apparent good reason, that added to the basis for suspicion. When he was spotted coming back from the reasonably suspected smugglers' rendezvous, with a passenger, (he had been alone when he turned west onto the Similkimeen River road) they stopped him. At that time there was "reasonable articulable suspicion that criminal activity is afoot."[9] Once the car was stopped, before the border patrol agent even talked to the driver, the marijuana odor wafting out the open window from the duffel in the back seat added quite a lot to the level of suspiciousness.

Mr. Alabau and Mr. Tiong correctly note that the place where the car was stopped was east of the suspected smugglers' rendezvous. That has little force, because if a person drove west to the suspected smugglers' rendezvous, picked up a smuggler, and then returned to Route 97 to head for the Interstate to Seattle, he would have to drive east from the rendezvous and pass by the golf course, where he was caught. They also note that every fact that gave rise to suspicion could be consistent with innocent behavior. That is true. Mr. Alabau could be driving down the Similkimeen River road to pick up a friend who was also going to Seattle. He could be looking for a secluded place for a nap, or a trip into the woods to relieve himself. The second person in his car could have been a friend he picked up, or a hitchhiker he met on the road. He could have been nervous just because people do not like being questioned by authorities, and could have planned to call his girlfriend when he stopped for breakfast to find out what her address was.

■ These innocent possibilities (and the absence of law violations in Mr. Rubio's observed conduct before the stop) do not undermine reasonable suspicion. The quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause.[10] It is merely "'a particularized and objective basis' for suspecting the person stopped of criminal activity."[11] Despite a possible innocent explanation for every police observation, a stop may be founded on reasonable suspicion. This one was, founded on a "particularized and objective basis," and represented nothing but good

**9.** *Illinois v. Wardlow*, —— U.S. ——, ——, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000).

**10.** *Wardlow*, —— U.S. at ——, 120 S.Ct. at 675.

**11.** *Ornelas*, 517 U.S. at 695, 116 S.Ct. 1657 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

police work. We have expressed skepticism about the use of such subjective and arguable police impressions as nervousness.[12] In this case they merely gave rise to more observation, not a stop. We have expressed disapproval in certain circumstances of ethnic factors being used as a basis for police suspicion.[13] They did not come up in this case. The stop itself was based on the objective and highly suspicious turn west at 5:30 a.m. toward the reasonably suspected smugglers' rendezvous, and the return east a few minutes later with a new passenger. A stop in such circumstances does not abridge a driver's Fourth Amendment rights.

▪ Mr. Tiong also argues that suppression is required because he was not advised of his right to contact his consulate. That issue is foreclosed by *United States v. Lombera–Camorlinga.*[14]

REVERSED.

---

12. *Montero–Camargo,* 208 F.3d at 1135–36.

13. *Id.* at 1131.

14. 206 F.3d 882 (9th Cir.2000) (en banc).